# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT ARKANSAS
### FAYETTEVILLE DIVISION

-------------------------------------------------------- x

JOSHUA DUGGAR,

                 Plaintiff,

       - against -

CITY OF SPRINGDALE, ARKANSAS;
WASHINGTON COUNTY, ARKANSAS; THE
STATE OF ARKANSAS DEPARTMENT OF
HUMAN SERVICES; DOUG SPROUSE, in his
official capacity; KATHY O'KELLEY, in her
official and individual capacities; ERNEST
CATE, in his official capacities; RICK HOYT, in
his official capacities; STEVE ZEGA, in his
official capacity; BAUER PUBLISHING
COMPANY, L.P.; BAUER MAGAZINE, L.P.;
BAUER MEDIA GROUP, INC.; BAUER, INC.;
HEINRICH BAUER NORTH AMERICA, INC.;
BAUER MEDIA GROUP USA, LLC; CROSS,
GUNTER, WITHERSPOON & GALCHUS,
P.C., and DOES 1-10, inclusive,

                Defendants.

-------------------------------------------------------

Civil Action No.: 17 Civ. 5125 (TLB)

 

# MEMORANDUM OF LAW IN SUPPORT OF
## MOTION BY DEFENDANTS BAUER PUBLISHING COMPANY, L.P.; BAUER MAGAZINE, L.P.; BAUER MEDIA SALES, INC.; BAUER, INC.; HEINRICH BAUER NORTH AMERICA, INC.; AND BAUER MEDIA GROUP USA, LLC TO DISMISS PLAINTIFF'S COMPLAINT

Defendants Bauer Publishing Company, L.P.; Bauer Magazine, L.P ("Bauer Magazine");

Bauer Media Sales, Inc.; Bauer, Inc.; Heinrich Bauer North America, Inc.; and Bauer Media Group

USA, LLC (collectively, the "Bauer Defendants") hereby submit this memorandum of law in

support of their motion pursuant to Fed. R. Civ. P. 12(b)(6) for an order dismissing the

Complaint and reasonable expenses, including attorneys' fees, resulting from Plaintiff Joshua

Duggar ("Plaintiff" or "Josh Duggar") filing this action pursuant to Arkansas Code Ann. § 16-

63-506.[1]

## PRELIMINARY STATEMENT

This action does not present a close case.  Plaintiff brings claims for invasion of privacy

and the tort of outrage against the Bauer Defendants for their publication of accurate information

obtained through Freedom of Information Act ("FOIA") requests related to the Arkansas police

department's investigation into Plaintiff's sexual assault of his sisters and one other victim.  In

case after case, the U.S. Supreme Court has consistently and unequivocally found that claims

arising out of the publication of lawfully obtained truthful information cannot withstand First

Amendment scrutiny.  This remains the rule even when the information at issue is highly

personal, like the name of a rape victim, or even when the information was made available

contrary to law, like in violation of a state statute prohibiting the publication of a rape victim's

name.  *See Florida Star v. B.J.F.,* 491 U.S. 524, 532 (1989); *Cox Broad. Corp. v. Cohn*, 420 U.S.

469 (1975).

Here, Plaintiff, a member of the famous Duggar family and former star of reality

television, brings these privacy and related claims based solely on Bauer Magazine's publication

---

[1] The Bauer Defendants apologize for burdening the Court with a similar memorandum of law in support of their motion to dismiss as previously filed in the *Dillard v. City of Springdale, Arkansas et al.*  (17 Civ. 5089) action (the "First Duggar Action") also before this Court.  The duplicative nature of the allegations and the motions to dismiss in this action and in the First Duggar Action further suggests these actions should be consolidated.

of admittedly truthful information contained in police reports of the investigation into him for felony sexual assault.  Plaintiff's own Complaint establishes that Bauer Magazine obtained the police reports in response to lawful FOIA requests.  Likewise, Plaintiff does not challenge the accuracy of the articles and instead primarily frame his claims based on the publication of the actual reports as obtained from the police.  Regardless of how stated, Plaintiff's claims fail as a matter of law under the wealth of established Supreme Court precedent and cannot be sustained consistent with the First Amendment.  This action should be dismissed.

If that were not enough – and it is – Plaintiff's claims independently fail for the basic reason that they do not plausibly plead critical elements for each of the alleged claims.  Thus, Plaintiff's (1) public disclosure of private facts claim fails because the articles at issue address matters of public concern and the police reports themselves establish that Josh's admitted assaults were well known within his church community; (2) appropriation claim fails for the basic reason that the articles at issue are newsworthy, not commercial speech; (3) intrusion claim fails because the alleged actions did not amount to actionable intrusion, such as a physical intrusion on Plaintiff's space; nor were the Bauer Defendants "substantially certain" that they lacked the legal right to publish, as required for the claim; and (4) outrage claim fails because publishing information obtained directly from the police does not begin to rise to the level of conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."  *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 600 F. Supp. 2d 1011, 1022 (W.D. Ark. 2009).

Lastly, Plaintiff's claims are also subject to dismissal under Arkansas' Citizen Participation in Government Act, Ark. Code Ann. §§ 16-63-501 *et seq.* (the "Anti-SLAPP statute"), which provides that "[a]ny person making a privileged communication or performing

2

an act in furtherance of the right of free speech or the right to petition government for a redress

of grievances . . . in connection with an issue of public interest or concern shall be immune from

civil liability . . . ." *Id.* § 504.  The publication of lawfully obtained truthful reports about felony

sexual assaults are plainly of public concern and involve an act in furtherance of the right to free-

speech.  As such, under the statute Plaintiff must verify, *inter alia*, that his claims are not based

on privileged communications immune from liability or meant to suppress free speech.  Plaintiff

cannot do so.  Unverified claims such as Plaintiff's must be dismissed and claims falsely verified

should be dismissed and attorneys' fees for the cost of responding to the complaint should be

imposed.  For all of these multiple and independent reasons, Plaintiff's claims should be

dismissed.

## FACTS

### A.      The Parties

Plaintiff Josh Duggar, his parents, Jim Bob and Michelle Duggar, and his eighteen other

siblings comprise the famous "Duggar family" that starred in the reality television show *19 Kids

and Counting* on the TLC cable network from 2008 to 2015.

Defendant Bauer Magazine is the owner and publisher of the magazine *In Touch Weekly*

("*In Touch*") and related website.  The remaining Bauer Defendants are Bauer Magazine's parent

or affiliate entities that played no role in the publication of the articles at issue.  The series of

articles about the Duggar family at issue in this litigation were published by *In Touch* beginning

on May 19, 2015.  Compl. ¶ 50.  The articles were primarily based on police reports received

from the Springdale Police Department and the Sheriff's Office in response to Bauer Magazine's

requests under FOIA.

Defendant the City of Springdale is a municipal corporation organized and existing under

the laws of the State of Arkansas that is responsible for the actions of the Springdale Police

3

Department.  *Id.* ¶ 22.  During the relevant time period, Defendant Doug Sprouse ("Sprouse")

was the mayor of Springdale, Defendant Ernest Cate ("Cate") was the City Attorney for the City

of Springdale and Defendant Kathy O'Kelley ("O'Kelley") was the Chief of Police for the City

of Springdale.  *Id.* ¶¶ 23-25.  (Defendants the City of Springdale, Sprouse, Cate, and O'Kelley

are collectively referred to herein as the "City Defendants.")

Defendant Washington County, Arkansas is a municipal corporation organized and

existing under the laws of the State of Arkansas that is responsible for the actions of the Sheriff's

Office.  *Id.* ¶ 27.  During the relevant time period, Defendant Rick Hoyt ("Hoyt") was a member

of the Sheriff's Office and Defendant Steve Zega ("Zega") was the County Attorney for

Washington County.  *Id.* ¶¶ 28, 29.  (Defendants Washington County, Arkansas, Zega, and Hoyt

are collectively referred to herein as the "County Defendants.")

**B.     Josh Duggar's Alleged Abuse Of Multiple Victims Is Investigated by Police**

In early December 2006, the Duggar family travelled to Chicago, Illinois to appear on

*The Oprah Winfrey Show*.  However, the producers of *Oprah* received a letter about an alleged

molestation by Josh Duggar and "faxed the letter to the [Arkansas] Department of Human

Services Hotline.  The report was then opened for investigation."[2]  The investigation centered on

Josh Duggar's sexual assault of four of his sisters and another female on multiple occasions in

2002 and 2003.  *Id.* ¶¶ 1, 45.  The felony offenses under investigation were identified as "sex

---

[2] *See* Springdale Police Department Offense Report, at 12 (the "Offense Report").  A copy of the Report is linked to
in the May 21, 2015 article at issue in this action.  http://www.intouchweekly.com/posts/bombshell-duggar-police-
report-jim-bob-duggar-didn-t-report-son-josh-s-alleged-sex-offenses-for-more-than-a-year-58906.  On a motion to
dismiss, this Court may consider documents referred to and relied on in the Complaint.  *See Marshall v. Nat'l Police
Gazette Corp.*, 195 F.2d 993, 994 (8th Cir. 1952) ("[a] copy of this article is attached to the complaint and by proper
reference made a part thereof.").  *See also Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) ("When
reviewing a motion to dismiss, a district court must consider the complaint in its entirety, as well as other sources
courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated
into the complaint by reference, and matters of which a court may take judicial notice."); *Marder v. Lopez*, 450 F.3d
445, 448 (9th Cir. 2006) ("A court may consider evidence on which the complaint necessarily relies if: (1) the
complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the
authenticity of the copy attached to the 12(b)(6) motion.").  Here, the *In Touch* articles and police reports are the
very basis for Plaintiff's claims.

offense – forcible fondling."  Offense Report at 1.  The Springdale Police Department notified the Sheriff's Office of the investigation and proposed working together.  Compl. ¶ 46.  At the time of the investigation Josh Duggar was an adult.

As part of the investigation, the Springdale Police Department interviewed four of Plaintiff's sexual assault victims, his four sisters, and three other siblings about the sexual assaults perpetrated by their brother.  *Id.* ¶¶ 4, 45, 47.  Plaintiff alleges that the Duggar family was assured of the confidentiality surrounding the interviews.  *Id.* ¶¶ 4, 47.  The interviews with Josh's victims and his other siblings were summarized and included in the Offense Report.  *Id.* ¶ 4.  As part of the investigation, the Sheriff's Office also conducted interviews with Plaintiff's parents, Jim Bob and Michelle Duggar, about the sexual assault of their children.  *Id.* ¶ 48.  Jim Bob and Michelle Duggar's interviews were summarized and included in the Offense Report and in the Sheriff's Office's Incident Report (the "Incident Report," and collectively the "Reports").  *Id.*[3]

The Incident Report reveals that Josh Duggar first admitted in March 2002 that he assaulted unidentified girls on four or five occasions and then again admitted to additional assaults in July 2002 and March 2003, including an assault of a "female friend of the family [who was] sleeping over."  Incident Report at 6.  The Incident Report indicates that after this series of incidents, Josh's father, Jim Bob Duggar, "met with the elders of his church and had told them what was going on" and they agreed that Josh needed treatment.  *Id.*  In March 2003, Josh entered a "Christian program in Little Rock" that "consisted of hard physical work and counseling."  *Id.*  However, the assaults were not reported to the police until some 16 months after Mr. Duggar first learned of the assaults.  *Id.* at 7.  In July 2003, Mr. Duggar and an elder of

---

[3] A copy of the Incident Report is linked to in the June 3, 2015 article challenged in the Complaint.  *Id.* ¶ 73.  The article is located at http://www.intouchweekly.com/posts/josh-duggar-chilling-molestation-confession-in-new-police-report-59752.

his church had a conversation with Cpl. Joseph Hutchins of the Arkansas State Police. *Id.* Cpl. Hutchins gave Josh "a very stern talk" but determined there was "nothing else to do." *Id.*[4]

As part of the Springdale Police Department's investigation that was eventually opened in 2006, Plaintiff refused to be interviewed and ultimately the police were not "able to locate an offense inside of the statute of limitations of three years for sexual assault." Offense Report at 32-33. As a result, the investigation was closed and no charges were brought. Compl. ¶¶ 5, 49-50.

## C.      The FOIA Requests

On May 15, 2015, Bauer Magazine, through their attorney, submitted two FOIA requests, one to the Springdale Police Department and the other to the Sheriff's Office, seeking all files related to Josh Duggar, Michelle Duggar, Jim Bob Duggar, and addresses related to the Duggar family. *Id.* ¶¶ 45, 48. The FOIA requests stated that Bauer Magazine had cause to believe that an incident report related to the Duggar family had been filed with the Springdale Police Department and the Sheriff's Office. *Id.* "Acting under color of law," on May 20, 2015, Defendant Kelley responded to Bauer Magazine's FOIA request by sending a redacted version of the Offense Report to Bauer Magazine. *Id.* ¶¶ 8, 55. On May 21, 2015, also "acting under color of law," the Sheriff's Office responded to Bauer Magazine's FOIA request with a redacted version of the Incident Report. *Id.* ¶¶ 9, 58. As alleged by Plaintiff, both Reports were "released to the media [by the police departments] for the express purpose of publication." *Id.* ¶ 57.

Allegedly concurrent with *In Touch*'s publication of the Offense Report, Joy Duggar, Plaintiff's sister, filed a motion with the Circuit Court of Washington County to expunge the

---

[4] As the May 27, 2015 article reports, in a "bizarre twist," Cpl. Hutchins was thereafter twice convicted of child pornography charges and is now serving a 56 year sentence in prison. http://www.intouchweekly.com/posts/duggar-breaking-news-disgraced-cop-who-didn-t-report-molestation-shoots-down-jim-bob-s-story-59235. The Incident Report also makes clear that Cpl. Hutchins' failure to report the alleged assault to the Child Abuse Hotline violated police procedures. Incident Report at 6.

Offense Report from the public record. *Id.* ¶ 69.  The motion was granted on May 21, 2015, after

the Offense Report had already been released to Bauer Magazine and published. *Id.* On May 26,

2015— after the Offense Report had been provided to Bauer Magazine and published—the

Court issued another ruling that juvenile records are not subject to FOIA disclosure. *Id.* ¶ 70.

**D.      Articles Published By *In Touch***

Plaintiff alleges that over eight articles were published on the *In Touch* website and in the

magazine between May 19, 2015 and June 3, 2015. *Id.* ¶¶ 14, 92.  (The *In Touch* articles at issue

in this action are collectively referred to herein as the "Articles").   Yet, the Complaint only

specifically identifies four of the eight articles published during this period. *Id.* ¶¶ 50, 65, 71, 73.

On May 19, 2015, an article titled *19 Kids and Counting Son Named in Underage Sex*

*Probe* was published on the *In Touch* website.  Compl. ¶ 50; *see also*

http://www.intouchweekly.com/posts/19-kids-and-counting-son-named-in-underage-sex-probe-

58751 (the "May 19 Article").[5]   The May 19 Article reported that Plaintiff, Josh Duggar "of the

TLC hit reality show *19 Kids and Counting* was named in a police report as the 'alleged

offender' in an underage sexual abuse probe. . . ." *Id.*  The May 19 Article does not in any way

identify the victims of the alleged sexual assault; nor does it contain any details concerning the

crime.  Indeed, as Plaintiff admits in a filing in this action:

> the [May 19 Article] addressed only the bare facts that Plaintiff
> had been investigated in relation to molestation accusations made
> while he was a minor.   The story did not reveal any [sic] the
> information at the heart of this lawsuit.  It revealed nothing about

---

[5] The companion print article dated June 1, 2015 and available for sale May 20, 2015 is titled "*Josh Duggar Named in Underage Sex Probe*."  A copy of the article, along with a print of the May 19 Article, is attached as Exhibit A to the Affidavit of Elizabeth A. McNamara, executed on September 11, 2017 ("McNamara Aff.").  The print article reports that Plaintiff and his family moved to Washington D.C. after "Josh accepted a high-profile lobbying job with conservative group Family Research Council" and that he is a "political affiliate" of such presidential hopefuls as Mike Huckabee, Senator Ted Cruz and others.  The online article similarly featured a photograph of Plaintiff speaking at what appears to be a Family Research Council event.  As set forth above, this Court may consider documents identified and relied on by the Complaint. *See supra* at n.1.

the alleged victims or the details of the alleged sexual contact as that information was not yet known to the public or part of the public record.

Pl.'s Opp'n to City Defs.' Mot. To Dismiss ("Pl.'s Opp'n"), at 24.  *See also id.* at 11.[6]

On May 21, 2015, a second article titled *Bombshell Duggar Police Report: Jim Bob Duggar Didn't Report Son Josh's Alleged Sex Offenses For More Than A Year* was published on *In Touch*'s website.  Compl. ¶ 65; http://www.intouchweekly.com/posts/bombshell-duggar-police-report-jim-bob-duggar-didn-t-report-son-josh-s-alleged-sex-offenses-for-more-than-a-year-58906 (the "May 21 Article").[7]  The May 21 Article contained a link to the redacted Offense Report released pursuant to Bauer Magazine's FOIA request by the Springdale Police Department on May 20, 2015.  *Id.*  Expressly crediting the Offense Report and noting that it was obtained through a FOIA request, the May 21 Article reports that Jim Bob Duggar waited more than a year after Josh confessed before contacting the police.  *Id.*  Likewise, it reports that Jim Bob "informed the elders of his church about Joshua's actions" and that "several members of their church were aware of the situation. . . ."  *Id.*  However, "[n]o one alerted the police or any other law enforcement agency" and instead Josh was sent to a program that "consisted of hard physical work and counseling."  *Id.*  Quoting from the Offense Report, however, the Article reports that Michelle Duggar admitted that "Josh did not receive counseling."  *Id.*

On May 26, 2015, a third article titled *Josh Duggar's Youngest Molestation Victim May Have Been As Young As 5-Years-Old* was published on *In Touch*'s website.  Compl. ¶ 71; http://www.intouchweekly.com/posts/josh-duggar-s-youngest-molestation-victim-may-have-

---

[6] The companion print article likewise does not identify any victim or include any details concerning the assault allegations.  The print companion article expressly stated that "*In Touch* is not naming the alleged victim of the sexual assault."  McNamara Aff. Ex. A at 24.

[7] The companion print article dated June 8, 2015 and available for sale on May 27, 2015 is titled *Inside the Duggars' Twisted World – House of Horrors.*  The May 21 Article and companion print article are attached as Exhibit B to the McNamara Aff.

been-as-young-as-5-years-old-59145 (the "May 26 Article"). [8]  The May 26 Article is very short

and reports, again relying on the Offense Report released to Bauer Magazine in response to its

FOIA request, that "one of Josh's victims was as young as five-years-old when Josh touched her

private parts," noting that "many details in the police report are redacted."  *Id.*  The May 26

Article also included a link to the same Offense Report originally published on May 21, 2015.

*Id.*

On June 3, 2015, a fourth article titled *Josh Duggar's Chilling Molestation Confession in

New Police Report* was published on *In Touch*'s website.  Compl. ¶ 73;

http://www.intouchweekly.com/posts/josh-duggar-chilling-molestation-confession-in-new-

police-report-59752 (the "June 3 Article.").[9]  The June 3 Article included a link to the Incident

Report provided to Bauer Magazine in response to its FOIA request by the Sheriff's Office.

Compl. ¶ 73.  The June 3 Article reports that Josh was 15 years old when he molested his five-

year-old sister and committed at least seven acts of sexual molestation.  *Id.*  Citing to the newly

released Incident Report, the June Article reports that, despite the confessions, the "Duggars

waited at least 16 months before contacting authorities about the molestations, even though the

behavior was continuing and growing worse."  *Id.*  Referencing legal experts, the June 3 Article

suggests that the Duggar parents "could have faced six years in prison for their inaction, if the

statute of limitations had not expired."  *Id.*

The last *In Touch* article identified by Plaintiff was published on April 28, 2017 and titled

---

[8] The May 26 Article is attached as Exhibit C to the McNamara Aff.

[9] The companion print article dated June 15, 2015 and available for sale on June 3, 2015 was titled "*Bombshell New Police Report.*"  A copy of the online June 3 Article and print article are attached as Exhibit D to the McNamara Aff.  Among the eight related articles published in *In Touch* and online presumably referenced in the Complaint, *see* Compl. ¶ 14, it is also reported that on July 16 TLC cancelled the Duggar reality show and within days of the news reports two of Plaintiff's sisters Jessa Seewald and Jill Dillard appeared in a national televised appearance on Fox News' *The Kelly Files* and identified themselves as among Josh's victims.  *See* http://www.intouchweekly.com/posts/19-kids-and-counting-cancelled-after-josh-duggar-s-molestation-scandal-63341; Fox News Interview of Jessa Seewald and Jill Dillard by Megyn Kelly, June 5, 2015.

*Josh Duggar Resurfaces Looking Heavier, Unkempt.*  Compl. ¶ 75;

http://www.intouchweekly.com/posts/josh-duggar-transformation-131162/photos/joy-anna-

duggar-austin-forsyth-247251 (the "April 28 Article"). [10]  The April 28 Article reports that

shortly after the molestation scandal came to light, "it was revealed that [Josh Duggar] not only

had an Ashley Madison account but also cheated on his wife."  *Id.*  The April 28 Article reports

that thereafter Josh "admitted his addiction to pornography and sex and entered rehab, where he

remained for six months."  *Id.*

**E.**      **Plaintiff's Allegations Against The Bauer Defendants**

Plaintiff brings four causes of action against the Bauer Defendants for (1) invasion of

privacy – public disclosure of private fact; (2) invasion of privacy – appropriation; (3) invasion

of privacy – intrusion upon seclusion; and (4) tort of outrage.  *See* Compl. ¶¶ 76-125.  These

claims are brought against the Bauer Defendants exclusively for the publication of the Offense

Report, the Incident Report, and the related Articles reporting information from the Reports.

Plaintiff's claims are barred by the First Amendment and Arkansas' Anti-SLAPP statute.

Alternatively, Plaintiff's claims also fail because Plaintiff does not plausibly allege facts

establishing the required elements of each claim.  Accordingly, Plaintiff's claims against the

Bauer Defendants must be dismissed.

<u>**ARGUMENT**</u>

**I.**      **PLAINTIFF FAILS TO STATE CLAIMS AGAINST THE BAUER
         DEFENDANTS ON WHICH RELIEF MAY BE GRANTED**

**A.**      **Legal Standard For Dismissal Under Rule 12(b)(6)**

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon

which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a

---

[10] A copy of the April 28 Article is attached as Exhibit E to the McNamara Aff.

complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570. While the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor when ruling on a motion to dismiss, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). *See also id.* at 681 (citing *Twombly*, 550 U.S. at 551); *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002) ("[T]he court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations.").

For purposes of this motion only, the Bauer Defendants accept Plaintiff's allegations as true.

### B.      Plaintiff's Publication Of Private Facts And Related Claims Against The Bauer Defendants Are Barred By The First Amendment And Must Be Dismissed

#### 1.      The First Amendment Bars Plaintiff's Claims Against The Bauer Defendants Notwithstanding Whether The City Or County Defendants Acted Properly In Disclosing The Reports

In an unbroken line of U.S. Supreme Court cases, followed by decisions across the country, it is uniformly recognized that when the press *lawfully* obtains truthful, newsworthy information – particularly when the information is contained in official government reports – its publication cannot be prohibited or punished.

> Our recent decisions demonstrate that state action to punish the publication of truthful information seldom can satisfy constitutional standards . . . . if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.

*Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102-03 (1979) (internal quotation marks omitted).

*See also Florida Star v. B.J.F.*, 491 U.S. 524, 532 (1989) (Florida statute making it unlawful to publish the name of a sexual assault victim is unconstitutional as applied where the information was truthful, lawfully obtained, and about a matter of public significance); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 837-38 (1978) (once the information comes legally into the hands of a member of the public, including the media, the interest in freedom of expression outweighs the state's interest in confidentiality); *Cox Broad. Corp. v. Cohn,* 420 U.S. 469, 492 (1975) (where rape victim's name became known to public through official court records dealing with rapist's trial, damages could not be recovered against newspaper for publishing victim's name in violation of state statute that criminalized such publication); *C.L., M.L. ex rel. C.A.L. v. Vill. Of Riverside*, No. 13 Civ. 1476, 2013 WL 4538836, at *2 (N.D. Ill Aug. 27, 2013) (dismissing plaintiffs' privacy claims because the police report detailing the minor's allegations of sexual abuse were "lawfully requested and received" from the police department pursuant to a FOIA request and "the report concerns a matter – allegations of sexual abuse by a public school teacher and members of the local community – in which the public has a legitimate interest.").

This black letter rule holds firm even assuming, as Plaintiff alleges here, that the City and County Defendants violated Arkansas law by disclosing the redacted Offense Report and Incident Report to Bauer Magazine.  *See* Compl. ¶¶ 8, 9, 57-59.  *Florida Star* is instructive on this point.   In *Florida Star* a rape victim sued a Florida newspaper for printing her full name in

an article discussing the crime in violation of the newspaper's internal policy *and* a Florida statute that imposed civil liability for publishing the name of a rape victim.  491 U.S. at 526-28. The newspaper obtained the victim's name from a police report erroneously placed in the police department's "pressroom," where access to the document was unrestricted.  *Id.* at 527-28.  The Supreme Court overturned a jury's verdict on an emotional distress claim brought by the rape victim, concluding that the First Amendment protected the newspaper.  *Id.* at 532.

As here, the *Florida Star* plaintiff argued that the newspaper did not lawfully obtain plaintiff's name because "under Florida law, police reports which reveal the identity of the victim of a sexual offense are not among the matters of 'public record' which the public, by law, is entitled to inspect."  *Id.* at 536; Compare Compl. ¶ 9 ("Disclosure of this information was in clear violation of state and federal law.").  *See also id.* at ¶¶ 8, 10-12.  In language equally applicable here, the Supreme Court nevertheless found

> the fact that state officials are not required to disclose such reports does not make it unlawful for a newspaper to receive them when furnished by the government.   Nor does the fact that the Department apparently failed to fulfill its obligation under [the applicable statute] not to 'cause or allow to be . . . published' the name of a sexual offense victim make the newspaper's ensuing receipt of this information unlawful.

*Id.* at 536.  In short, it is simply irrelevant whether it was proper or improper for the Springdale Police Department and the Sheriff's Office to release the Reports to Bauer Magazine.[11]

---

[11] As the City and County Defendants have argued, the release of the Offense and Incident Reports was *not* improper.  In fact, the City and County Defendants acted in compliance with Arkansas' FOIA statute.  *See* City Defs.' Br. in Support of their Mot. to Dismiss at 12-17 (the "City Defs.' Br."); County Defs.' Br. in Support of their Mot. to Dismiss at 8 (the "County Defs.' Br.").  FOIA's intent is to allow "the public to be fully apprised of the conduct of public business."  *Bryant v. Weiss*, 983 S.W.2d 902, 904 (Ark. 1998).  *See also* Ark. Code Ann. § 25-19-102.  Accordingly, courts "liberally interpret [] FOIA to accomplish its broad and laudable purpose," while exemptions to FOIA are construed narrowly.  *Thomas v. Hall*, 399 S.W.3d 387, 390 (Ark. 2012).  FOIA requests are not to be denied because "information exempt from disclosure is commingled with nonexempt information," but instead "[a]ny reasonably segregable portion of the record shall be provided after deletion of the exempt information."  Ark. Code Ann. § 25-19-105(f).   As the City and County Defendants argue, the FOIA exemption asserted by Plaintiff, Ark. Code. Ann. § 12-18-104(a), does not apply to the perpetrator of a crime.  *See* City Defs.'

Plaintiff's Complaint could not be more definitive:  the Offense and Incident Reports were released "under color of law" to Bauer Magazine pursuant to FOIA requests and were "released to the media for the express purpose of publication."  Compl. ¶¶ 8, 9, 57.  Under binding Supreme Court precedent, Bauer Magazine's publication of the truthful information contained in the Reports is not actionable.

For good reason, the Supreme Court of Arkansas has followed the clear holding of *Florida Star* and held that the First Amendment protected a newspaper's publication of a rape victim's name based on a police report and witnesses statements *even if* those reports should not have been made available to the newspaper.  In *Whiteside v. Russellville Newspapers, Inc.*, 295 S.W.3d 798, 801 (Ark. 2009), *cert. denied*, 130 S. Ct. 247 (2009), the Arkansas Supreme Court held that "the Newspaper should not be faulted for obtaining the report on the [police records] system when it was placed there by an employee of the police department devoid of any restrictions. . . . While the release of a specific portion of the report may have been a mistake made by the police, it was not the result of any wrongdoing by the Newspaper."  *Id.* at 802-03 (citing *Florida Star*, 491 U.S. 524).  In rejecting the exact argument Plaintiff puts forth here— that the publisher should have known that information was improperly provided by the government—the Arkansas Supreme Court held:

> there is nothing to suggest that the privilege is lost because the Newspaper failed to investigate whether or not it was supposed to have access to that portion of the report.  In fact, the United States Supreme Court has held that the First Amendment protects against the 'timidity and self-censorship' that may result from such an

---

Br. at 16.  Moreover, there is no law or precedent establishing that the Springdale Police Department or the Sheriff's Office are subject to Ark. Code. Ann. § 12-18-104(a) or that the relied upon exemption should be treated differently than other exemptions under FOIA and not construed narrowly.  *See id.* at 16-17.  Plaintiff's reliance on another exemption, Ark. Code Ann. § 9-27-309(j), is misplaced as Josh Duggar was an adult at the time of the investigation and there are no allegations that he was arrested or detained, as required by the statute.  Moreover, § 9-27-309(j) was recently amended to address the exact circumstances at issue here, further highlighting the lack of clarity under the prior statutory scheme as to whether the Reports were exempt from disclosure.  *See id.* at 14-15.

> approach. [citing *Florida Star*, 491 U.S. 524]. It seems clear that an inadvertent release of information is not analogous to an involuntary release or an illegal gain of information . . . . It was not incumbent upon the Newspaper to determine what information could or could not be published after its release by the police.

*Id.* at 803–04 (2009).

Here, Bauer Magazine made FOIA requests to the Springdale Police Department and Sheriff's Office for all files related to or mentioning Josh Duggar, Michelle Duggar, Jim Bob Duggar, and addresses related to the Duggar family. *See* Compl. ¶¶ 45, 48. The Springdale Police Department and Sheriff's Office complied with the FOIA requests by sending redacted versions of the Offense Report and Incident Report to Bauer Magazine. *See id.* ¶¶ 55, 58. Whether or not the Springdale Police Department and Sheriff's Office properly released the Reports or properly redacted the Reports under Arkansas law has no bearing on *In Touch*'s lawful publication of the released information. *See Florida Star*, 491 U.S. at 536.[12]

---

[12] Nothing in the undisputed sequence of events supports any allegation that Bauer Magazine obtained the Reports illegally. However, even if Bauer Magazine had reason to know the Reports were obtained illegally—which they were not—the Bauer Defendants' conduct would *still* be protected under the First Amendment. In *Bartnicki v. Vopper*, the Supreme Court assumed that the interception of a private call was unlawful and that the defendants had reason to know of its illegality. 532 U.S. 514, 524-25 (2001). The Court concluded that despite the illegal source of the intercepted communications, the First Amendment *still* protected the defendants' public disclosures, holding that "illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." *Id.* at 535.

Bauer Magazine's protected right to publish the Reports is similarly unaffected by a court order directing the report be expunged from the public record issued *after* the Offense Report had already been published on the *In Touch* website and other websites. *See* Compl. ¶ 14 ("Almost immediately [after posting the Offense Report], other tabloids and users on social media picked up on the article, linking to the original post or summarizing its contents"), ¶ 68 ("Numerous media outlets and websites picked up on the story, and posted links to it, further exposing millions of people to the Offense Report"); ¶ 69. In a telling decision, *Oklahoma Publ'g Co. v. District Court*, 430 U.S. 308 (1977) (*per curiam*), the Supreme Court struck down a state-court injunction prohibiting the media from publishing the name or photograph of an 11-year-old where the public, including reporters, were previously permitted to attend a hearing where the juvenile's name and image were available, notwithstanding a state statute allowing juvenile trials to be closed to the public. The Supreme Court held that once the truthful information was "publicly revealed" or "in the public domain" the court could not constitutionally restrain its dissemination. *Id.* at 312 (citing *Cox Broad. Corp.*, 420 U.S. at 495). *See also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 567 (1976) (where a court imposed a broad order against the press disclosing information related to a highly publicized crime, including details of the crime and name of the victims, but thereafter held a preliminary hearing open to the public and the press where such information was available, the Court found that "once a public hearing had been held, what transpired there could not be subject to prior restraint."); *Fann v. City of Fairview, Tenn.*, 905 S.W.2d 167, 172 (Tenn. Ct. App. 1994) (finding "that [the newspaper's] receipt of the information, including the expunged material, was not

To impose liability on the Bauer Defendants for disclosing truthful information provided to them through proper legal channels by government officials would likely result in publications censoring themselves and "depriv[e] protection to those who rely on the government's implied representations of the lawfulness of dissemination . . . forc[ing] upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication." *Florida Star*, 491 U.S. at 536-37, 538. As the Supreme Court instructs, the First Amendment does not allow such liability to be imposed. Accordingly, Plaintiff cannot maintain his claims against the Bauer Defendants and they must be dismissed.[13]

### 2. Articles Reporting On The Investigation Of Plaintiff's Alleged Crimes Indisputably Addressed A Matter Of Public Concern

Unequivocal Supreme Court precedent also dictates a finding as a matter of law that it is "clear" that a news article about a criminal sexual assault investigation "concern[s] 'a matter of public significance" because "the commission, and investigation, of a violent crime which had been reported to authorities" "involve[s] a matter of paramount public import." *Florida Star*, 491 U.S. at 536-37. *See also Cox Broad. Corp.*, 420 U.S. at 492 ("The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions . . . are

---

unlawful."); *G.D. v. Kenny*, 15 A.3d 300, 300, 304, 314 (N.J. 2011) (finding plaintiff "had no reasonable expectation of privacy that information so long in the public domain before the entry of the expungement order would be erased from the public's mind or from papers already widely disseminated").

[13] Courts across the country, following the Supreme Court precedent, dismiss actions like this one, based on publication of truthful facts obtained from the government. *See, e.g., Gates v. Discovery Commc'ns, Inc.*, 101 P.3d 552, 562 (Cal. 2004) ("following *Cox* and its progeny, we conclude that an invasion of privacy claim based on allegations of harm caused by a media defendant's publication of facts obtained from public official records of a criminal proceeding is barred by the First Amendment to the United States Constitution."); *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 471 (Tex. 1995) (dismissing the privacy action where "the information disclosed by the newspaper," obtained by the newspaper through an unredacted police report regarding plaintiffs' sexual assault "concerned matters of legitimate public concern" ); *Fann*, 905 S.W.2d at 172 (liability could not be imposed on newspaper where the newspaper lawfully received information relating to plaintiffs' criminal history, including an expunged arrest record).

without question events of legitimate concern to the public"); *Lowe v. Hearst Commc'ns*, 414 F. Supp. 2d  669, 674 (W.D. Texas 2006) ("[r]eports of the investigation of crimes or matters pertaining to criminal activity have almost *without exception* been held to be newsworthy or matters of legitimate public interest as a matter of law.") (emphasis added), *aff'd,* 487 f.3d 246 (5th Cir. 2007); *C.L., M.L. ex rel. C.A.L.*, 2013 WL 4538836, at *2 ( "the report concerns a matter—allegations of sexual abuse by a public school teacher and members of the local community—in which the public has a legitimate interest.").  Accordingly, the Articles reporting on the investigation into Plaintiff's sexual assaults "without question" address matters of public concern.

Indeed, in actions involving private individuals, not public figures like the Duggars, court after court across the country has not hesitated to find that reports concerning criminal investigations or arrests address matters of legitimate public interest and cannot support claims for public disclosure of private facts or related claims.  Consider, for example, *Anderson v. Suiters*, 499 F.3d 1228 (10th Cir. 2007).  There, the plaintiff was raped by her estranged husband while she was unconscious and he videotaped the incident.  The plaintiff turned the videotape over to the police and obtained a promise "that the videotape would be kept confidential and would be used only for law enforcement purposes." *Id.* at 1231.  The husband was arrested on sexual assault charges and, in connection with reporting on the prosecution, a reporter from the local television station obtained a copy of the video and used a brief excerpt in the news report. Even on these facts, the Tenth Circuit had no problem concluding that the use of the videotape was "substantially relevant to a matter of legitimate public interest:  the prosecution of [plaintiff's] husband, a local attorney, for rape, as well as for other sexual assault charges involving multiple victims." *Id.* at 1236.  *See also Anonsen v. Donahue,* 857 S.W.2d 700, 704

(Tex. App. Ct. 1993) (faced with a report by a wife on a television talk show revealing for the first time that her Arkansas police officer ex-husband raped her 11 year-old daughter and the child subsequently born was raised by the family as the daughter's sibling was not actionable because there is "no doubt that, as a matter of law, the crimes of incest and rape, the victimization of innocent people whose lives are touched by those crimes, and the importance of fostering understanding and healing of those victims, are matters of legitimate public concern.").[14]

Here, there can be no question that the Articles reporting on the Offense and Incident Reports concerning Plaintiff's alleged felony molestations of multiple victims address issues of public concern.  The fact that the Articles concerned criminal investigations alone dictate this conclusion, but it is underscored by the public figure status of Plaintiff and the fact that the allegations were not brought to the attention of the police for well over a year and, even then, the police officer failed to report the allegations to the Arkansas Child Abuse Hotline, as required. And, as the Articles make clear, Plaintiff's admissions of wrongdoing also exposed the hypocrisy of his employment as an Executive Director of the conservative, faith-based, Washington, D.C. lobbying group Family Research Council ("FRC") at the time his conduct came to light in 2015.[15] As the Articles report, in his position with FRC, Plaintiff was "a political affiliate of presidential hopeful Mike Huckabee, Senator Ted Cruz, Senator Rick Santorum, Indiana Governor Mike Pence and Wisconsin Governor Scott Walker."  McNamara Aff. Ex. A at 24; *see also* Ex. B at 32

---

[14] *See also Hogan v. Hearst Corp.*, 945 S.W.2d 246, 249, 253 (Tex. App. Ct. 1997) (dismissing privacy and related claims based on a news report of a man's arrest for indecent exposure in a park, where the man committed suicide thereafter believing he was "outed" as a homosexual, finding the article reported on information received from a police department and was therefore not actionable).

[15] *See Josh Duggar hired by Family Research Council,* Fox News, June 19, 2013, available at http://www.foxnews.com/entertainment/2013/06/19/josh-duggar-hired-by-family-research-council.html.  FRC describes its mission as "advanc[ing] faith, family and freedom in public policy and the culture from a Christian worldview" by advocating and lobbying elected government officials for socially conservative policies.  *See* http://www.frc.org/mission-statement.

("Republican presidential candidate Mike Huckabee has close ties to the Duggar family . . .").

The obvious public importance of the information disclosed in the *In Touch* Articles and the

Offense Report and Incident Report is borne out by the fact that the Duggar family's reality

television show was canceled and Plaintiff was forced to step-down from his position at the FRC

as a result of his sexual abuse becoming public.[16]  In short, for multiple reasons, including the

dispositive fact that the Articles reported on an investigation of felony allegations, there can be

no dispute that the Articles address issues of public concern and are not actionable.[17]

---

[16] *See* http://www.intouchweekly.com/posts/19-kids-and-counting-cancelled-after-josh-duggar-s-molestation-scandal-63341; *Josh Duggar Apologizes Amid Molestation Allegations, Quits Family Research Council*, The Washington Post, May 22, 2017, available at https://www.washingtonpost.com/news/acts-of-faith/wp/2015/05/21/josh-duggar-apologizes-resigns-from-family-research-council-amid-molestation-allegations/?utm_term=.e958414cedd3.

[17] The fact that Plaintiff's sisters were minors at the time of the investigation, Plaintiff was a minor at the time of the sexual assaults (but not the investigation), and the alleged privacy of unredacted information in the Reports does not alter the clear conclusion that sexual assault is a matter of public concern.  *See Cox Broad. Corp.*, 420 U.S. at 492 (finding the publication of a seventeen year old rape victim's name was a matter of public concern); *Oklahoma Publishing Co.*, 430 U.S. at 311(finding newspaper could not be held liability for publishing a juvenile offender's name and image lawfully obtained from court proceedings); *Smith*, 443 U.S. at 104-05 (striking down West Virginia law criminalizing publication of minor offender's name by a newspaper); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982) (striking down a Massachusetts statute that absolutely barred press access to rape trials in which the victims are minors).  Moreover, courts have consistently refused to distinguish between newsworthy and non-newsworthy facts and impose liability based on publication of purportedly non-newsworthy facts where, as here, the publication is of legitimate public concern and the facts published are related to the newsworthy topic.  *See Lowe v. Hearst Commc'ns, Inc.*, 487 F.3d 246, 251 (5th Cir. 2007) ("This Circuit has declined to get involved in deciding the newsworthiness of specific details in a newsworthy story where the details were 'substantially related' to the story."); *Gilbert v. Med. Econ. Co.*, 665 F.2d 305, 308–09 (10th Cir. 1981) ("While it is true that these subjects would fall outside the first amendment privilege in the absence of either independent newsworthiness or any substantial nexus with a newsworthy topic, here they are connected to the newsworthy topic by the rational inference that plaintiff's personal problems were the underlying cause of the acts of alleged malpractice."); *C.L., M.L. ex rel. C.A.L.*, 2013 WL 4538836, at *3  (rejecting plaintiff's argument that "the public's legitimate interest does not extend to the explicit and prurient details of the minor plaintiffs' allegations" because even assuming "that details about the sexual abuse of minors falls within the scope of 'highly personal information . . . that most people are reluctant to disclose to strangers. . . .the Individual Defendants cannot be held liable for disseminating a lawfully obtained police report that touches on matters of legitimate public concern, even if the report also contains private details falling outside the scope of public's interest.'").  Courts reject the notion that information obtained from the government should be parsed for newsworthy and non-newsworthy details.  *Star-Telegram, Inc.*, 915 S.W.2d at 475 (refusing to impose liability where newspaper published articles about plaintiff's sexual assault, including details of the sexual assault and personal information that allegedly allowed plaintiff to be identified as the victim despite the newspaper not publishing her name).  *See also Ross v. Midwest Commc'ns, Inc.*, 870 F.2d 271, 275 (5th Cir. 1989) (directing judges to "resist the temptation to edit journalists aggressively.  Reporters must have some freedom to respond to journalistic exigencies without fear that even a slight, and understandable, mistake will subject them to liability. Exuberant judicial blue-pencilling after-the-fact would blunt the quills of even the most honorable journalists.").  Here, the facts disclosed in the Reports are not only related to the sexual assault felony but, as discussed above, independently address issues of public concern.

### C.      The Articles Are Protected Under The Fair Report Privilege

Independent of the Constitutional constraints on Plaintiff's claims, they fail because the Articles are privileged as fair reports of police investigations.  Arkansas recognizes the fair report privilege as stated in the Restatement (Second) of Torts § 611:  "The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported."  *Butler v. Hearst-Argyle Television, Inc.*, 49 S.W.3d 116, 119 (Ark. 2001) (recognizing and applying the fair report privilege defined in Restatement (Second) of Torts § 611 to dismiss an action for invasion of privacy, defamation, and the tort of outrage).  *See also Whiteside*, 295 S.W.3d at 801; Restatement (Second) of Torts § 611, cmt. b ("If the report of a public official proceeding is accurate or a fair abridgment, an action cannot constitutionally be maintained, either for defamation or for invasion of the right of privacy.").  The fair report privilege may only be lost "by a showing of fault in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgment."  *Butler*, 49 S.W.3d at 121.  Here, the fair report privilege applies to the publication of the Offense and Incident Reports, and the related Articles, as the Articles are properly considered an "accurate or a fair abridgment" of "reports of official proceedings" that "deal with a matter of public concern."[18]

The law in Arkansas is clear, police reports and witness statements are "reports of official proceedings" subject to the fair report privilege.  *See Butler*, 49 S.W.3d at 119; *Whiteside*, 295 S.W.3d at 802 ("generally, information released by the police, including reports and records, is

---

[18] Plaintiff does not allege that the Articles were an inaccurate summary of the Offense Report or Incident Report. In fact, the majority of Plaintiff's claims are based on the fact that Bauer Magazine published verbatim copies of the redacted Offense Report and Incident Report as they were received from the Springdale Police Department and Sheriff's Office.  *See* Compl. ¶¶ 71, 75.  *See also id.* at 22 (heading "Unlawful Publication of The Offense Report, Incident Report, and Details of the Investigation").

considered to be a report of an official action subject to the fair-report privilege." (collecting cases)); *see also* Restatement (Second) of Tort § 611, cmt. d).  The investigation by the Springdale Police Department and Sheriff's Office into the sexual assaults perpetrated by Plaintiff was an official action resulting in official reports, the Offense and Incident Reports. Compl. ¶ 4.  Plaintiff himself refers to the Incident and Offense Reports as "official" reports.  *See id.*

As already established, under unequivocal Supreme Court precedent, a news article about a criminal investigation into sexual assault "concern[s] 'a matter of public significance" because "the commission, and investigation, of a violent crime which had been reported to authorities" "involve[s] a matter of paramount public import."  *See supra* at 16-19.  *See also Florida Star*, 491 U.S. at 537.  The Articles reporting on the Offense and Incident Reports by Bauer Magazine are protected by the fair report privilege and for this independent reason claims related to these Articles cannot be maintained as a matter of law.

### D.   Plaintiff Fails To Plausibly State Necessary Elements For Each Claim Under Arkansas Law

#### 1.   Plaintiff Fails To State A Claim For Invasion Of Privacy – Public Disclosure Of Private Facts

Beyond being plainly incompatible with the First Amendment, Plaintiff also fails to plausibly allege requisite elements of his publication of private facts claim.  *In re Dunbar*, 446 B.R. 306, 314 (Bankr. E.D. Ark. 2011) (listing the elements of a publication of private facts claim as "[o]ne who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.") (citing Restatement (Second) of Torts § 652D).  Here, Plaintiff's claim fails since the Articles clearly addressed issues of legitimate concern to the public.  *See supra* at 16-19.

Further, the Offense and Incident Reports establish that the facts regarding Plaintiff's molestation of his sisters were not private when published.  "Elders" from the Duggars' church, a family friend, a separate individual who reported the abuse, and Cpl. Joseph Hutchins of the Arkansas State Police all were aware of Josh Duggar's sexual assaults prior to the publication of the Articles.  *See* Incident Report at 6-7; Offense Report at 15.  Jim Bob told the Sheriff's Office that "several members of their church were aware of the [Josh] situation and had been supportive."  Incident Report at 6.  Facts known by an extended group of people cannot be considered private.  *See*, *e.g.*, *Sipple v. Chronicle Publ'g Co.*, 154 Cal. App. 3d 1040, 1045, 1047 (Cal. Ct. App. 1984) (dismissing public disclosure of private facts claim where despite his family not knowing, "[t]he undisputed facts reveal that prior to the publication of the newspaper articles in question appellant's homosexual orientation and participation in gay community activities had been known by hundreds of people").

Separately, Plaintiff cannot state a claim arising out of the May 19 Article.  As he admits, that Article did not include "highly offensive" information because it "addressed only the bare facts that Plaintiff had been investigated in relation to molestation accusations made while he was a minor.  *The story did not reveal any [sic] the information at the heart of this lawsuit.  It revealed nothing about the alleged victims or the details of the alleged sexual contact as that information was not yet known to the public or part of the public record.*"  Pl.s' Opp'n at 25 (emphasis added).  *See also id.* at 11.  Based on the Offense and Incident Reports and Plaintiff's own admission, Plaintiff fails to state a claim for publication of private facts.

### 2.      Plaintiff Fails To State A Claim For Invasion of Privacy – Appropriation

Arkansas courts have adopted the definition of appropriation in the Restatement (Second) of Torts, which states "one who appropriates to his own use or benefit the name or likeness of

22

another is subject to liability to the other for invasion of privacy."  *Stanley v. Gen. Media Commc'ns, Inc.*, 149 F. Supp. 2d 701, 706 (W.D. Ark. 2001) (citing Restatement (Second) of Torts § 652(c)).  In order to sustain an appropriation claim, Plaintiff must plausibly allege, among other essential elements, that "defendants' use of plaintiffs' name or likeness was for defendants' own purposes or benefit, commercial or otherwise."  Ark. Model Jury Instr. Civil § 421.  "[A]ppropriation requires *commercial* use of a person's name or likeness."  *Stanley*, 149 F. Supp. 2d at 706 (emphasis original).

The appropriation tort is not well-developed in Arkansas, but other courts "that have recognized the appropriation tort have also *uniformly* held that the First Amendment bars appropriation liability for the use of a name or likeness in a publication that concerns matters that are newsworthy or of legitimate public concern."  *Battaglieri v. Mackinac Ctr. For Pub. Policy*, 680 N.W.2d 915, 917 (Mich. Ct. App. 2004) (finding "plaintiffs' appropriation claim must fail because [defendant's] publication" of plaintiff's statement in its fundraising letter "was protected by the First Amendment because its subject matter was a matter of legitimate public concern").  *See also Bogie v. Rosenberg*, 705 F.3d 603, 614-15 (7th Cir. 2013) (dismissing a claim of appropriation for the inclusion of an individual's conversation with the comedian Joan Rivers in a documentary about the comedian because the documentary was a matter of public interest); *Lane v. Random House, Inc.*, 985 F. Supp. 141, 145, 146 (D.D.C. 1995) (dismissing a claim of appropriation for the unauthorized use of plaintiff's picture and name to promote an author's book disclaiming plaintiff's theories of the Kennedy assassination finding the use was in the general public interest and newsworthy); *Joe Dickerson & Assocs., LLC v. Dittmar*, 34 P.3d 995, 997 (Colo. 2001) (finding "that the defendant's use of the plaintiff's name and likeness in the context of an article about the plaintiff's crime and felony conviction is a matter of legitimate

public concern and is, therefore, privileged."); *Chaplin v. Nat'l Broad. Co*., 15 F.R.D. 134, 138-39 (S.D.N.Y. 1953) (dismissing a claim for unauthorized use of Plaintiff's name in radio broadcasts because plaintiff was a prominent public figure whose activities were of general public concern). As established above, *see supra* at 16-19, reports regarding Plaintiff's molestation of his sisters are newsworthy and a matter of public concern that may not form the basis for his appropriation claim and thus, must be dismissed.

The fact that Bauer Magazine is engaged in the business of publishing or that the Bauer Defendants are for-profit entities does not diminish the application of the First Amendment; nor does it mean that publication was for a commercial, non-newsworthy, purpose. Again, the U.S. Supreme Court rebuts the premise of Plaintiff's claim. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973) ("If a newspaper's profit motive were determinative, all aspects of its operations—from the selection of news stories to the choice of editorial position—would be subject to regulation if it could be established that they were conducted with a view toward increased sales. Such a basis for regulation clearly would be incompatible with the First Amendment."). *See also Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 801 (1988) ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak."); *New York Times Co. v. Sullivan,* 376 U.S. 254, 266 (1964) ("That the Times was paid for publishing the advertisement is as immaterial in this connection *as is the fact that newspapers and books are sold*.") (emphasis added). Plaintiff attempts to skirt the well-established principle that books, magazines, movies and the like all enjoy full First Amendment protection even though they are sold for profit by noting that at least one *In Touch* Article referred readers to the companion print article on the same topic. *See* Compl. ¶ 50. But,

publishers have the constitutional right to "tout" themselves in promotional spots or advertisements and the Articles at issue are a far cry from advertising and other commercial uses that are at the heart of an appropriation claim. *See Leddy v. Narragansett Television, L.P.*, 843 A.2d 481, 490 (R.I. 2004) ("free-speech considerations protect brief rebroadcasts of previously televised investigative reports or other newsworthy events to promote [sic] a news medium from such invasion-of-privacy or wrongful-use claims."); *Lane*, 985 F. Supp. at 147 ("While the newsworthiness privilege may not apply to an advertisement for a non-speech product, it does apply to advertisements for speech products—even those that propose a commercial transaction."). Accordingly, Plaintiff cannot as a matter of law claim the Articles were for a commercial use and his appropriation claim must be dismissed.

### 3. Plaintiff Fails To State A Claim For Invasion of Privacy – Intrusion Upon Seclusion

As with the other invasion of privacy torts, Arkansas courts have adopted the definition of intrusion upon seclusion as set forth in the Restatement (Second) of Torts. The Restatement states "[o]ne who intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871, 875 (8th Cir. 2000) (citing Restatement (Second) of Torts § 652B). To establish a claim for intrusion upon seclusion, Plaintiff must plausibly allege: (1) "that he sustained damages;" (2) "that the defendant intentionally intruded physically or otherwise upon plaintiff's solitude or seclusion and believed or was substantially certain that he lacked the necessary legal authority or personal permission, invitation, or valid consent to commit the intrusive act;" (3) "that the intrusion was of a kind that would be highly offensive to a reasonable person, as the result of conduct to which a reasonable person would

strongly object;" (4) "that the plaintiff conducted himself in a manner consistent with an actual expectation of privacy;" and (5) "that the defendant's intrusion was the proximate cause of the plaintiff's damages." *Coombs v. J.B. Hunt Transp., Inc.*, 388 S.W.3d 456, 460-61 (Ark. Ct. App. 2012) (citing Ark. Model Jury Instr. Civil 420 (2011)); *Wal-Mart Stores, Inc. v. Lee*, 74 S.W.3d 634, 720-21 (Ark. 2002).

At a minimum, Plaintiff has not plausibly alleged that an actionable intrusion occurred. "This type of invasion of privacy is generally associated with either a physical invasion of a person's property or by eavesdropping on another's conversation with the aid of wiretaps, microphones or spying." *Gill v. Snow*, 644 S.W.2d 222, 224 (Tex. App. 1982) (citing Restatement (Second) of Torts § 652B, cmt. b, c, and d) *abrogated on other grounds by Cain v. Hearst Corp.*, 878 S.W.2d 577 (Tex. 1994). *See also Steinbuch v. Hachette Book Grp.*, No. 08 Civ. 00456 (JLH), 2009 WL 963588, at *3 (E.D. Ark. Apr. 8, 2009) (dismissing intrusion claim where plaintiff failed to allege that defendant intruded "by invading another's home or other quarters, an illegal search, eavesdropping upon private conversations, peering into the windows of a home, persistent and unwanted telephone calls, unauthorized prying into a bank account, or the like.").

As with his opposition to the City Defendants' motion to dismiss on this point, Plaintiff will no doubt argue that the tort of intrusion is not limited to physical intrusion but includes "infringement upon a person's emotional sanctum and the notions of civility and personal dignity." Pl.'s Opp'n at 26 (citing *Coombs*, 388 S.W.3d at 460-61; *Fletcher*, 220 F.3d at 876). Yet, the *dicta* in *Coombs* does not support Plaintiff's position as there, unlike here, the intrusion at issue was in fact physical. Plaintiff alleged that unwanted visitors entered his room, undressed him, wrote on his body, and took pictures of him undressed. *Coombs*, 388 S.W.3d at 461.

Likewise, in *Fletcher*, the court addressed allegations that an employer improperly used a workers' compensation medical authorization form to obtain an employee's medical records where no workers' compensation claim had been asserted. *Fletcher*, 220 F.3d at 876. The court, however, found an intrusion claim could not stand because "that information could otherwise have been obtained by proper means." *Id.* Plaintiff cites no authority – nor could he – to support a claim that an intrusion occurs by the mere act of publishing police reports and information contained therein obtained pursuant to proper FOIA requests. Plaintiff alleges no physical invasion, eavesdropping, or spying by anyone, let alone the Bauer Defendants, as required to allege an intrusion claim. In short, mere publication of lawfully obtained information does not amount to an actionable intrusion under *Coombs* or *Fletcher*.

Similarly, Plaintiff has not, and cannot, allege that an intrusion occurred because as a matter of law, the Bauer Defendants did not "believe[], or [were] substantially certain, that [they] lack[] the necessary legal or personal permission to commit the [alleged] intrusive act." *See Wal-Mart Stores, Inc.*, 74 S.W.3d at 645 ("[a]n intrusion occurs when an actor believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act.") (internal citations omitted). Bauer Magazine's publication of facts regarding the sexual assault investigation, including the Offense Report and Incident Report, were protected under the First Amendment. *See Florida Star*, 491 U.S. at 492. While Plaintiff contends that the Bauer Defendants knew or should have known that the Offense Report and Incident Report were improperly disclosed to them by the Springdale Police Department and Sheriff's Office, even if true, based on unequivocal Supreme Court precedent, the Bauer Defendants had the "necessary legal . . . permission" to publish facts related to the investigation and the Offense and Incident Reports. Accordingly, Plaintiff's intrusion upon seclusion claim must be dismissed.

### E.   Plaintiff Fails To State A Claim For Tort Of Outrage

In order for Plaintiff to sufficiently allege a claim for tort of outrage, he must show: (1) defendants intended to inflict emotional distress or willfully and wantonly knew or should have known that emotional distress would be the likely result of their conduct; (2) the conduct was extreme and outrageous; (3) the actions of the defendants were the cause of the Plaintiff's distress; and (4) the emotional distress sustained by the Plaintiff was so severe that no reasonable person could be expected to endure it.   *Finch v. Texarkana Sch. Dist. No. 7 of Miller Cty.*, 557 F. Supp. 2d 976, 984-85 (W.D. Ark. 2008); *Thornton v. Squyres*, 877 S.W.2d 921, 922 (1994).  As this Court has previously explained:

> The test for outrage is an extremely narrow test that is committed by the most heinous conduct.   Merely describing the conduct as outrageous does not make it so. Extreme and outrageous conduct is conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'

*Wolfe*, 600 F. Supp. 2d at 1022 (internal citations omitted).  The Supreme Court of Arkansas is clear that courts take "a strict approach and give[] a narrow view to the tort of outrage." *Travelers Ins. Co. v. Smith*, 991 S.W.2d 591, 595 (Sup. Ct. Ark. 1999).

Plaintiff's allegations do not even begin to rise to the level of outrage required to plausibly allege an outrage claim.  This is particularly true when, as here, the outrage is properly directed at Plaintiff, not the Bauer Defendants.  In *Wolfe*, a juvenile student's "next of friends" brought claims, including the tort of outrage, against a school district official alleging that the juvenile student was subject to years of anti-gay harassment by his fellow students while the school official, instead of disciplining the students, improperly inquired into the student's sexuality and stated the student "got what he deserved" after an altercation with another student. 600 F. Supp. 2d at 1022.  Despite the school official's alleged conduct, this Court dismissed the

tort of outrage claim because "[t]he truly egregious conduct at issue in this case was that of students, not of [the school district official]" and the student's conduct "cannot be imputed to [the school district official] to make his conduct shocking." *Id.*

Similarly here, the only conduct attributed by Plaintiff to the Bauer Defendants is the publication of newsworthy information of public concern regarding sexual assaults committed by a public figure. This does not come close to the type of conduct courts have *refused* to find sufficiently outrageous. *Hogan*, 945 S.W.2d at 252 (finding defendants "publishing information contained in public records, as a matter of law, was not outrageous" even where the man committed suicide believing he was "outed" as a homosexual). *See also*, *e.g.*, *Garner v. Kees*, 848 S.W.2d 423, 425 (Ark. 1993) (finding that a nursing home employee's placement of sugar packets in a diabetic patient's casket was not outrageous); *Neff v. St. Paul Fire & Marine Ins. Co.*, 799 S.W.2d 795, 795-96 (Ark. 1990) (finding hospital's release of patient's stillborn fetus to patient's intoxicated husband which led to patient having to claim the fetus from the county jail where her husband was held for drunk driving was not outrageous); *Mikell v. Sch. Admin. Unit No. 33*, 972 A.2d 1050, 1053 (N.H. 2009) (finding a special education teacher's false report regarding a student where the student subsequently took his own life leaving a note that "stated he was telling the truth about the disciplinary incident" was not outrageous). Plainly, publishing information released by the police in response to FOIA requests does not allege a tort of outrage and thus, must be dismissed.

## II.   PLAINTIFF'S CLAIMS ARE SUBJECT TO ARKANSAS' ANTI-SLAPP STATUTE

### A.   Plaintiff's Claims Are Based On Acts Made In Furtherance Of The Right To Free Speech Immunized From Civil Liability

In 2005, the Arkansas legislature enacted the Anti-SLAPP statute, known as "Citizen Participation in Government Act," Arkansas Code Ann. §§ 16-63-501 *et seq.*, declaring that

29

"[t]he valid exercise of the constitutional rights of freedom of speech and the right to petition government for a redress of grievances should not be chilled through abuse of the judicial process." *Id.* § 502.  In enacting this legislation, the Arkansas legislature recognized that "[t]he threat of a civil action for damages in the form of a strategic lawsuit against political participation and the possibility of considerable legal costs can act as a deterrent to citizens who wish to report information to federal, state, or local agencies" and "effectively punish concerned citizens for exercising the constitutional right to speak and petition the government for a redress of grievances." *Id.*  The statute provides that "[a]ny person making a privileged communication or performing an act in furtherance of the right of free speech or the right to petition government for a redress of grievances . . . in connection with an issue of public interest or concern shall be immune from civil liability, unless a statement or report was made with knowledge that it was false or with reckless disregard of whether it was false." *Id.* § 504.

Acts immunized under the statute include but are not limited to "any written or oral statement, writing, or petition made . . . [b]efore or to a legislative, executive, or judicial proceeding, or other proceeding authorized by a state, regional, county, or municipal government or . . . [i]n connection with an issue under consideration or review by a legislative, executive, or judicial body, or other body authorized by a state, regional, county, or municipal government." Ark. Code Ann. § 16-63-503.  *See also* P. Caleb Patterson, *Have I Been Slapped? Arkansas's Attempt to Curb Abusive Litigation: The Citizen Participation in Government Act*, 60 Ark. L. Rev. 507, 521 (2007) (noting that Arkansas' Anti-SLAPP statute "would cover actions such as the signing or circulation of a petition, testifying against a developer at a zoning hearing, writing a letter to an elected official, reporting police misconduct, and a litany of other common First

Amendment Petition Clause activities.").  "Privileged Communications" are also immune from civil liability and are defined as communications:

> (i) [i]n, to, or about an issue of public concern related to any legislative, executive, or judicial proceeding, or other proceeding authorized by a state, regional, county, or municipal government; (ii) [i]n the proper discharge of an official duty; and (iii) [b]y a fair and true report of any legislative, executive, or judicial proceeding, or other proceeding authorized by a state, regional, county, or municipal government, or anything said in the course of the proceeding.

Ark. Code. Ann. § 16-63-503.

Plaintiff's claims arise solely from the Articles which report on the Springdale Police Department and the Sheriff's Office investigation of Plaintiff for sexually abusing his sisters and one other victim.  *See* Compl. ¶¶ 65, 71, 75, 86-87, 92-93, 108-09.  The Articles are protected from civil liability under Section 504 as they plainly involve an act in furtherance of the right to free-speech and enjoy First Amendment protection.  *See supra* at 11-19.  *See also*, *e.g.*, *Florida Star*, 491 U.S. at 537; *Cox Broad. Corp.*, 420 U.S. at 492.  The Articles also fall within non-exhaustive enumerated list of protected acts under Section 503:  they were made "in connection with an issue under consideration or review"—the investigation into Plaintiff for the sexual abuse of his sisters and another victim—by a "body authorized by [the] state, regional, county, or municipal government"—the Springdale Police Department and Sheriff's Office acting in their official capacities.  *See* Ark. Code Ann. § 16-63-503; *see also Hindu Temple & Cmty. Ctr. of High Desert, Inc. v. Raghunathan*, 311 Ga. App. 109, 114-15 (Ga. App. 2011) (finding "statements to police or statements made in furtherance of an ongoing investigation regarding [defendant's] alleged criminal activity" were "in furtherance of the right . . . to petition government for a redress of grievances and thus represents the type of speech that the anti-SLAPP statute is designed to protect").  That the Articles appeared in an entertainment-news

31

magazine is irrelevant; "constitutional guarantees of freedom of expression apply with equal

force to . . . a news report or an entertainment feature." *Shulman v. Group W Prods., Inc.*, 18

Cal. 4th 200, 220 (1998).  *See also Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186

(9th Cir. 2001) (*Los Angeles* magazine feature on Hollywood fashion was constitutionally

protected); *Best v. Berard*, 776 F. Supp. 2d 752, 758 (N.D. Ill. 2011) ("The status of [the

program at issue] as an entertainment program, as opposed to a pure news broadcast, does not

alter the First Amendment analysis.").

Likewise, there is no doubt that the Articles are in connection with an issue of public

concern.  The articles fall squarely within a well-established category of public concern – the

investigation into and commission of serious crimes.  *See supra* at 16-19.  *See also Florida Star*,

491 U.S. at 537 ("the commission, and investigation, of a violent crime which had been reported

to authorities," including reports about sexual assault, concern "a matter of public

significance.").

### B.      Plaintiff's Complaint Cannot Be Verified In Compliance With Section 505

Because Plaintiff's actions are subject to the Anti-SLAPP statute, Plaintiff was required

to "file contemporaneously with the pleading . . . a written verification."  Ark. Code Ann. § 16-

63-505.  The verification must certify that: (1) Plaintiffs or their attorneys read the claim; (2)

"the claim is well grounded in fact and is warranted by existing law or a good faith argument for

the extension, modification, or reversal of existing law;" (3) the claim is not based on a

"privileged communication;" and (4) "[t]he claim is not asserted for any improper purpose such

as to suppress the right of free speech or right to petition government of a person or entity, to

harass, or to cause unnecessary delay or needless increase in the cost of litigation."  *Id.*

Plaintiff has not verified his Complaint as required by Section 505.  *Id.* § 506.  Instead

Plaintiff's verification states only that "the facts and allegations" in the Complaint "are true and

accurate." Compl. at 42.  While Plaintiff has ten days from now to properly verify the Complaint, *id.* § 506, any verification would violate Section 505.  As discussed *supra*, Plaintiff's claims are based on privileged communications protected under the Anti-SLAPP statute and are not warranted by existing law.  Plaintiff can assert no "good faith" belief that U.S. Supreme Court precedent protecting the Articles should be extended, modified, or reversed.  In fact, Supreme Court precedent is clear that the Articles are protected from liability by the First Amendment. *See supra* at 11-19.  It is also clear that Plaintiff brings this action as a way to suppress the Bauer Defendants' right to engage in free speech or face costly and lengthy litigation—the exact choice Anti-SLAPP statutes protect against.

For these reasons, Plaintiff cannot verify his claims as required under the Anti-SLAPP statute.  Unverified claims must be stricken and claims verified in violation of Section 505 may be dismissed and plaintiffs ordered to pay defendants "the amount of the reasonable expenses incurred because of the filing of the claim, including a reasonable attorney's fee." *Id.* § 506. The Bauer Defendants ask this Court to dismiss Plaintiff's Complaint as it cannot be verified in compliance with Section 505 and award reasonable attorneys' fees to the Bauer Defendants resulting from the improper filing of Plaintiff's claims.

## <u>CONCLUSION</u>

Since Plaintiff's claims are barred by the First Amendment and the Anti-SLAPP statute or alternatively, Plaintiff has failed to plausibly allege facts supporting his claims, the Bauer Defendants respectfully submit that the Court should grant their motion to dismiss the Complaint under Rule 12(b)(6) and award reasonable expenses, including attorneys' fees, incurred as a result of Plaintiff filing this action pursuant to Arkansas Code Ann. § 16-63-506.

Dated: New York, New York
       September 11, 2017

                                 Respectfully submitted,

                                 DAVIS WRIGHT TREMAINE LLP

                                 By:  /s/ Elizabeth A. McNamara
                                 Elizabeth A. McNamara
                                 Jamie S. Raghu
                                 1251 Avenue of the Americas, 21st Floor
                                 New York, New York 10020
                                 Telephone: (212) 489-8230
                                 Fax: (212) 489-8340
                                 Email:   lizmcnamara@dwt.com
                                         jamieraghu@dwt.com

                                 Cynthia W. Kolb
                                 CROSS, GUNTER, WITHERSPOON & GALCHUS, P.C.
                                 500 President Clinton Avenue, Suite 200
                                 Little Rock, Arkansas 72201
                                 Telephone: (501) 371-9999
                                 Fax: (501) 371-0035
                                 Email:    ckolb@cgwg.com

                                 *Attorneys for Defendants Bauer Publishing Company, L.P.; Bauer Magazine, L.P.; Bauer Media Sales, Inc.; Bauer, Inc.; Heinrich Bauer North America, Inc.; and Bauer Media Group USA, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of September, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

Gregory F. Payne
Attorney at Law
438 E. Millsap Road, Suite 103
Fayetteville, AR 72703

Travis Wayne Story
Story Law Firm, PLLC
P.O. Box 9210
Fayetteville, AR 72703

Jason E. Owens
Rainwater, Holt & Sexton, P.A.
P.O. Box 17250
Little Rock, AR 72222-7250

Robert Justin Eichmann
Thomas N. Kieklak
Harrington, Miller, Kieklak, Eichmann & Brown, P.A.
4710 S. Thompson, Ste. 102
Springdale, AR 72764

Susan Keller Kendall
Kendall Law Firm, PLLC
3706 Pinnacle Hills Parkway, Suite 201
Rogers, AR 72758

/s/ Jamie S. Raghu